EXHIBIT "A-1"

Electronically Filed
7/14/2014 10:23:49 AM
Lois Rogers, Smith County District Clerk

Lora Rhodes, Deputy

14-1796-A

CAUSE NO. _____

| | |
|---|---|
| DENISE BRAGG, PAULA GREGORY, BRENDA ABOUARRA, HYLY BARTOS, MELISSA BLOCKER, VIRGINIA BOTRUFF, WENDY BROWNING, CHRISTINE BURKE, THOMAS F. BURKE, JENNIFER CALL, DEBORAH CHAMBERS, DELLA COLLINS, TERESA COOK, MADELINE FAIELLA, VICKIE FISCHER, BERNADETTE GILLESKI, EVELYN GRAHAM, KAREN HAGER, AMY HOLT, MARCIA KANE, DEBRA LANGENDORF, CHRISTINA LATHROP, TAMMY LAYTON, HELEN LINGLE, KIM LOCKMAN, SANDRA LOFARO, MARYANN MACK, PATRICIA MILLER, VIRGINIA MURPHY, CAROL NORRIS, MARTI NORTHOVER, BARBARA NOWAK, VICTORIA OVERTON, BARBARA PARIS, DARLENE REISS, SUSAN RICHARDS, VERNA ROSENBERG, CAROL J. SALES, SUSAN SCHMIDT, FELICIA SCOTT, EUGENE SCOTT, DEANNA STEVENS, CORALENE STEVERSON, JOSEPHINE TEDESCHI, BARBARA ROSE TEWKSBURY, BRENDA J. THOMPSON, DONNA TRAVERS, KATHLEEN VERTZ, and HEIDI WOOLEY,   Plaintiffs,   vs.   JOHNSON & JOHNSON and ETHICON, INC.,   Defendants. | IN THE DISTRICT COURT            _____ JUDICIAL DISTRICT            SMITH COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION AND JURY DEMAND

COME NOW, Plaintiffs, and file their Original Petition and Jury Demand complaining of

Defendants Johnson & Johnson and Ethicon, Inc., and for cause of action, would respectfully

show the Court as follows:

## DISCOVERY LEVEL

1.      Plaintiffs intend that discovery be conducted under Level 3 pursuant to Rule 190.4 of the

Texas Rules of Civil Procedure.

## PARTIES AND SERVICE

2.      Plaintiff Denise Bragg is an individual and resident of Cherokee County, Texas.  She was

implanted with the Pelvic Mesh Products, more specifically described below, on September 19,

2006 at Mother Frances Hospital in Tyler, Texas.

3.      Plaintiff Paula Gregory is an individual and resident of the State of New Jersey.  She was

implanted with the Pelvic Mesh Products, more specifically described below, at Baptist Hospital

for Women in Memphis, Tennessee.

4.      The state of residence for the remaining female and male (consortium) Plaintiffs, along

with further information more specifically described below, can be found on the table attached

hereto as Exhibit 1, which is incorporated herein by reference as if set out in full.

5.      Defendant Johnson & Johnson ("Defendant J&J") is a foreign corporation organized and

existing under the laws of New Jersey, whose home office address is 1 Johnson & Johnson Plaza,

New Brunswick, New Jersey, 08933.  Defendant J&J may be served with process by serving the

Texas Secretary of State, 1019 Brazos Street, Austin, Travis County, Texas 78701, as its agent

for service because Defendant J&J engages in business in Texas but does not maintain a regular

place of business in this state or a designated agent for service of process, and this suit arose

from Defendant J&J's business in Texas.

6.      Defendant Ethicon, Inc. ("Defendant Ethicon") is a New Jersey corporation licensed to

do business in Texas that is located at U.S. Route No. 22 West, Somerville, New Jersey 08876-

0151 and may be served with process by serving its registered agent, CT Corp System, 350 N.

St. Paul Street, Suite 2900, Dallas, Texas 75201.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over the lawsuit because the amount in controversy exceeds

this Court's minimum jurisdictional requirements.

8.     The Court has jurisdiction over the nonresident Defendants because they purposefully

availed themselves of the privileges and benefits of conducting business in Texas by committing

torts, which are the subject of this suit, in whole or in part in Texas, as more specifically

described in the paragraphs that follow.

9.     Pursuant to Section 15.002(a) of the Texas Civil Practice and Remedies Code, venue is

proper in Harris County, Texas because this is the county in which all or a substantial part of the

events giving rise to this claim occurred.

10.    Joinder of Plaintiffs' claims is proper because the claims arise out of a series of

transactions or occurrences and there are questions of law and fact common to Plaintiffs' claims.

*See* TEX. R. CIV. P. 40(a).  Moreover, Plaintiffs claims are not wholly distinct and have a

sufficient nexus among them to be joined in one common cause of action.  Specifically, all of

Plaintiffs' claims involve, among others, the following common issues of fact and law:

   a.     The same defendant manufacturers, Defendants J&J and Ethicon;

   b.     The GYNECARE GYNEMESH PS PROLENE Mesh for vaginal wall prolapse

          surgical treatment was designed, manufactured, marketed, packaged, labeled, and

          sold by Defendants J&J and Ethicon ("Pelvic Mesh Products");

c.    The Pelvic Mesh Products that are marketed by the J&J Defendants as permanent medical device implants for the treatment of pelvic organ prolapse and stress urinary incontinence;

d.    The Pelvic Mesh Products are manufactured with the same polypropylene resin;

e.    The Pelvic Mesh Products are comprised of the same defective polypropylene mesh;

f.    Plaintiffs have similar injuries that are due to the defective polypropylene mesh and the effects such defective mesh has on Plaintiffs' bodies;

g.    Implanting physicians who attended similar training programs provided by Defendants J&J and Ethicon prior to implantation of the Pelvic Mesh Products in Plaintiffs;

h.    The same FDA 510k clearance process prior to marketing by Defendants J&J and Ethicon;

i.    Reliance by Defendants J&J and Ethicon on the same scientific studies and testing of the Pelvic Mesh Products;

j.    Common claims against Defendants J&J and Ethicon including claims of negligence, products liability, failure to warn, and manufacturing and design defects; and

k.    Common defenses of Defendants J&J and Ethicon, including but not limited to, the learned intermediary doctrine, contributory negligence, lack of an alternative design, third-party liability, and preemption.

**NO FEDERAL CLAIMS PLEADED**

11.     Plaintiffs' claims in this action are brought solely under state law.  Plaintiffs do not herein bring, assert, or allege, either expressly or impliedly, any causes of action arising under any federal law, statute, regulation, or provision.  Thus, there is no federal jurisdiction in this action on the basis of a federal question under 28 U.S.C. § 1331.

12.     Furthermore, federal diversity jurisdiction is lacking in this action.  Complete diversity does not exist between the parties and therefore the federal courts lack jurisdiction under 28 U.S.C §1332.

**FACTS**

**The Pelvic Mesh Products**

13.     At all times relevant herein, Defendants J&J and Ethicon ("J&J Defendants") were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, marketing, packaging, labeling, and selling such devices, including the Pelvic Mesh Products.  <u>All Plaintiffs were implanted with these Pelvic Mesh Products.</u>  The Pelvic Mesh Products implanted in each female Plaintiff, the dates the Pelvic Mesh Products were implanted in each female Plaintiff, and the state of residence for each Plaintiff can be found on the table attached hereto as Exhibit 1, which is incorporated herein by reference as if set out in full

14.     The Pelvic Mesh Products are products targeted at women who suffer from pain, discomfort, and stress urinary incontinence as a result of weakening or damage to the walls of the vagina.  The Pelvic Mesh Products are represented by the J&J Defendants to correct and restore normal vaginal structure by implantation of polypropylene mesh in the vaginal wall tethered in place by two arms that extend up through the buttocks.  They are specifically

promoted to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma, and minimal pain while correcting stress urinary incontinence and pelvic organ prolapse.

15.     Prior the implantation of the Pelvic Mesh Products at issue in this claim, the J&J Defendants sought and obtained Food and Drug Administration ("FDA") clearance (not approval) to market the Pelvic Mesh Products under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act.  Section 510(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976.  No formal review for safety or efficacy is required.

16.     Despite claims that the monofilament polypropylene mesh in the Pelvic Mesh Products is inert, the scientific evidence shows that this material is biologically incompatible with human tissue and promotes an immune response.  This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh.  Certain information was available in the medical literature regarding the dangers of polypropylene mesh and manufacturers and physicians should have been aware of this literature, including:

    a.     Shrinkage and bacteria lead to an evolving process and increased erosion (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J  2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449).

    b.     Polypropylene mesh has long been known to shrink (Klinge U.  Eur J Surg 1998; 164:965,  Jacquetin B.  Int Urogyn J  2009; 20:893,  Tunn R.  Ultrasound Obstetrics Gynecol 2007; 29:449).  By 1998, polypropylene mesh was known to shrink 30-50%. This was subsequently confirmed in 2007 (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B.  Int Urogyn J 2009; 20:893, Tunn R.  Ultrasound

Obstetrics Gynecol 2007; 29:449).    Predominate infection/inflammation was noted in 2007 in explanted polypropylene samples (Yahi Y.  Int Urogyn J 2007; 18(Suppl 1):S149).

c.   The weave of the mesh produces very small interstices which allow bacteria to enter and to hide from the host defenses designed to eliminate them.  The bacteria can secrete an encasing slime (biofilm) which further serves to protect them from destruction   by   white   blood   cells   and   macrophages   (Osterberg   B. ActaChirScand1979; 145:431, Merritt K.  J BiomatAppl 1991; 5:185, An Y.  J Biomed Mater Res (ApplBiomat) 1998; 43:338).

d.   The large surface area promotes wicking of fluids and bacteria which provides a safe haven for bacteria which attach themselves to the mesh during the insertion process (Mahmoud W. J Biomat Sci Polymer Ed 1996; 7:751, Klinge U. J Biomed Mater Res 2002; 63:765, Vollebregt A. Int Urogyn J 2009; 20:1345).

e.   The size of the mesh placed equates to a large surface area with many places for bacteria to hide while being protected from host defenses (Mahmoud W.  J Biomat Sci Polymer Ed 1996; 7:751, Klinge U. J Biomed Mater Res 2002; 63:765, Vollebregt A. Int Urogyn J 2009; 20:1345).

f.   Polypropylene is impure:   There is no such thing as pure polypropylene. Polypropylene contains about 15 additional compounds which are leached from the polypropylene and are toxic to tissue which enhances the inflammatory reaction and the intensity of fibrosis (Sternschuss G. J Urol 2012; May 12 epub, Frostling H. Scand J Work Environ Health 1984; 10:163).

g.   Prolene[TM] (polypropylene) was shown to be not inert in 1986 and again in 2003

with flaking and fissuring demonstrated by scanning electron microscopy which leads to degradation and release of toxic compounds. This enhances the inflammatory and fibrotic reactions (Coda A. Hernia 2003; 7:29, Jongebloed WL. Doc Ophthalmol 1986; 64:143–52).

h.   With the loss of polypropylene due to degradation, the surface area is greatly increased thus providing greater areas for bacterial adherence and more elution of toxic compounds from the polypropylene and also the freed toxic polypropylene itself, all of which increases the inflammatory reaction and intensity of fibrosis (Jongebloed W. Doc Ophth 1986; 64:143, Sternschuss G. J Urol 2012; May 12 epub, Clave A. Int Urogyn J 2010; 21:261).

17.   The J&J Defendants marketed the Pelvic Mesh Products to the medical community and to patients as safe, effective, and reliable medical devices that can be implanted by safe, effective, and minimally invasive surgical techniques.

18.   The J&J Defendants marketed and sold the Pelvic Mesh Products through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing and the provision of valuable cash and non-cash benefits to healthcare providers. The J&J Defendants also utilized documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety and utility of these products.

19.   Contrary to the representations and marketing of The J&J Defendants, the Pelvic Mesh Products have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating revision surgeries, and have caused severe and irreversible

injuries, conditions, and damage to a significant number of women, including Plaintiffs.  The defects stem from many issues, including:

    a.    the use of polypropylene material in the Pelvic Mesh Products and the immune reaction that results;

    b.    the design of the Pelvic Mesh Products to be inserted transvaginally into an area of the body with high levels of pathogens that adhere to the mesh, which can cause immune reactions and subsequent tissue breakdown;

    c.    the contraction or shrinkage of the mesh;

    d.    biomechanical issues with the design of the mesh that create strong amounts of friction between the mesh and the underlying tissue that subsequently cause that tissue to degrade;

    e.    the use and design of anchors in the Pelvic Mesh Products that when placed correctly are likely to pass through and injure major nerve routes in the pelvic region;

    f.    degradation of the mesh itself over time which causes the internal tissue to degrade;

    g.    the welding of the mesh itself during production, which creates a toxic substance that contributes to the degradation of the mesh and host tissue; and

    h.    the design of the trocars (devices used to insert the Pelvic Mesh Products into the vagina) requires tissue penetration in nerve-rich environments, which results frequently in the destruction of nerve endings.

20.    Upon information and belief, the J&J Defendants have consistently underreported and withheld information about the propensity of its Pelvic Mesh Products to fail and cause injury

and complications, and have misrepresented the efficacy and safety of these products, through various means and media, actively and intentionally misleading the public.

21.     Despite the chronic underreporting of adverse events associated with the Pelvic Mesh Products, enough complaints were recorded for the Food and Drug Administration ("FDA") to issue a public health notification regarding the dangers of these devices.

22.     On October 20, 2008, the FDA issued a Public Health Notification that described over a thousand (1,000) complaints (otherwise known as "adverse events") that had been reported over a three-year period relating to the Pelvic Mesh Products and other similar products.  Although the FDA notice did not identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that the J&J Defendants are some of the manufacturers of the products that are the subject of the notification.

23.     On July 13, 2011, the FDA issued a Safety Communication entitled, "UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse." Therein, the FDA advised that it had conducted an updated analysis of adverse events reported to the FDA and complications reported in the scientific literature and concluded that surgical mesh used in transvaginal repair of pelvic organ prolapse was an area of **"continuing serious concern."**  (emphasis added) The FDA concluded that serious complications associated with surgical mesh for transvaginal repair of pelvic organ prolapse were "not rare." These serious complications include, but are not limited to, neuromuscular problems, vaginal scarring/shrinkage, and emotional problems.  Many of the serious complications required medical and surgical treatment and hospitalization. The FDA concluded that it was not clear that transvaginal repair of pelvic organ prolapse and stress urinary incontinence with mesh kits was more effective than traditional non-mesh repair of these

conditions.  The FDA conducted a systematic review of the published scientific literature from 1996 to 2011 and concluded that transvaginal pelvic organ prolapse repair with mesh "does not improve symptomatic results or quality of life over traditional non mesh repair." In the July 13, 2011 Safety Communication, the FDA concluded that "a mesh procedure may put the patient at risk for requiring additional surgery or for the development new complications. Removal of the mesh due to mesh complications may involve multiple surgeries and significantly impair the patient's quality of life.  Complete removal of mesh may not be possible." The information contained in the FDA's Public Health Notification of October 2008 and the FDA Safety Communication of July 13, 2011 was known or knowable to Defendants and was not disclosed in any manner.

24.     The J&J Defendants have further known the following:

    a.    that some of the predicate devices for the Pelvic Mesh Products had high failure and complication rates, resulting in the recall of some of these predicate devices;

    b.    that there were and are significant differences between the Pelvic Mesh Products and some or all of the predicate devices, rendering them unsuitable for designation as predicate devices;

    c.    that these significant differences render the disclosures to the FDA incomplete and misleading; and

    d.    that the Pelvic Mesh Products were and are causing numerous patients severe injuries and complications.

25.     The J&J Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with others, including the female Plaintiffs.  As a result, the J&J Defendants actively and intentionally misled and continue to

    

mislead the public into believing that the Pelvic Mesh Products and the procedures for implantation were and are safe and effective.

26.     The J&J Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Pelvic Mesh Products.

27.     The J&J Defendants failed to design and establish a safe, effective procedure for removal of the Pelvic Mesh Products; thus, in the event of a failure, injury, or complications, it is impossible to easily and safely remove the Pelvic Mesh Products.

28.     Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for repair of pelvic organ prolapse and stress urinary incontinence have existed at all times relevant to this matter.

29.     The Pelvic Mesh Products were at all times utilized and implanted in a manner foreseeable to the J&J Defendants, as they generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physicians.

30.     The J&J Defendants provided incomplete, insufficient, and misleading training and information to physicians to increase the number of physicians utilizing the Pelvic Mesh Products, and thus increase the sales of these products.

31.     The Pelvic Mesh Products implanted into the female Plaintiffs were in the same or substantially similar condition as they were when they left the possession of the J&J Defendants, as well as being in the condition directed by and expected by these Defendants.

32.     The female Plaintiffs and their physicians foreseeably used and implanted the Pelvic Mesh Products, and did not misuse or alter these products in an unforeseeable manner.

33.     The injuries, conditions, and complications suffered by women who have been implanted with the Pelvic Mesh Products include, but are not limited to, mesh erosion, mesh contraction,

infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual

intercourse), blood loss, acute and chronic nerve damage and pain, pudendal nerve damage,

pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, and prolapse of organs.

In many cases, these women have been forced to undergo intensive medical treatment, including,

but not limited to, the use of pain control and other medications, injections into various areas of

the pelvis, spine, and the vagina, and surgeries to remove portions of the female genitalia, to

locate and remove mesh, and to attempt to repair pelvic organs, tissue, and nerve damage.

34.     The medical and scientific literature studying the effects of polypropylene pelvic mesh

(like the material used in the Pelvic Mesh Products) have examined each of these injuries,

conditions, and complications and determined that they are in fact casually related to the mesh

itself and do not often implicate errors related to the implantation of the devices.

35.     The J&J Defendants knew and had reason to know that the Pelvic Mesh Products could

and would cause severe and grievous personal injury to the users of the Pelvic Mesh Products,

and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or

otherwise downplayed warnings.

36.     At all relevant times herein, the J&J Defendants continued to promote Pelvic Mesh

Products as safe and effective even when no clinical trials had been done supporting long or

short term efficacy.

37.     At all relevant times herein, the J&J Defendants failed to provide sufficient warnings and

instructions that would have put the female Plaintiffs and the public on notice of the dangers and

adverse effects caused by implantation of the Pelvic Mesh Products.

38.     The Pelvic Mesh Products were defective as marketed due to inadequate warnings,

instructions, labeling, and/or inadequate testing.

**Medical Care at Issue**

39.     On the dates provided above and on Exhibit 1, the female Plaintiffs were implanted with the Pelvic Mesh Products, the use for which the J&J Defendants marketed and sold these products.

40.     As a result of the implantation of the Pelvic Mesh Products, the female Plaintiffs suffered and will continue to suffer serious bodily injuries, including pain, discomfort, pressure, difficulty voiding urine, continued incontinence, discharge, scarring, infection, odor, and bleeding.

**CAUSES OF ACTION:**

**NEGLIGENCE**

41.     On the occasion in question, the injuries and damages sustained by Plaintiffs were proximately caused by the negligence of the J&J Defendants in failing to use reasonable care in designing, manufacturing, marketing, labeling, packaging, and/or selling the Pelvic Mesh Products.

42.     Each act or omission of negligence, acting separately or in combination, was a proximate cause of the damages and injuries to Plaintiffs.

**STRICT LIABILITY, DESIGN DEFECT**

43.     At the time the female Plaintiffs' physicians implanted the Pelvic Mesh Products in the female Plaintiffs, the J&J Defendants were engaged in the business of selling and /or supplying these products.

44.     The Pelvic Mesh Products were defectively designed when sold.

45.     The Pelvic Mesh Products were unreasonably dangerous, taking into consideration the utility of these products and the risks involved in their use.

46.     The Pelvic Mesh Products reached the female Plaintiffs' physicians and Plaintiffs without substantial change in the condition in which they were sold.

47.     The defective and unreasonably dangerous condition of the Pelvic Mesh Products was a proximate cause of the damages and injuries to Plaintiffs.

48.     Thus, the J&J Defendants are strictly liable to Plaintiffs.

## STRICT LIABILITY, MANUFACTURING DEFECT

49.     The Pelvic Mesh Products that were implanted in the female Plaintiffs were unreasonably dangerous, not reasonably safe for their intended use, and were defective as a matter of law with respect to their manufacture.

50.     The defective and unreasonably dangerous condition of the Pelvic Mesh Products was a proximate cause of the damages and injuries to Plaintiffs.

51.     Thus, the J&J Defendants are strictly liable to Plaintiffs.

## STRICT LIABILITY, FAILURE TO WARN

52.     The J&J Defendants supplied the Pelvic Mesh Products that were implanted in the female Plaintiffs.

53.     At all times mentioned herein, the Pelvic Mesh Products were dangerous and presented a substantial danger to patients who were implanted with them.

54.     The risks and dangers associated with the Pelvic Mesh Products were known to the J&J Defendants at the time of implantation in the female Plaintiffs, yet these Defendants failed to provide warnings of such risks and dangers to the female Plaintiffs.

55.     Ordinary consumers would not have recognized the potential risks and dangers the Pelvic Mesh Products posed because their uses were specifically promoted to improve the health of

such patients while the nature and prevalence of such risks were either downplayed or not provided to consumers and their physicians.

56.     The Pelvic Mesh Products were used in a way reasonably foreseeable to the J&J Defendants by the female Plaintiffs, particularly given the educational material or instructions given to physicians in regard to these products.

57.     The failure of the J&J Defendants to adequately warn about the risks and dangers associated with the Pelvic Mesh Products was a proximate cause of the damages and injuries to Plaintiffs.

58.     Thus, the J&J Defendants are strictly liable to Plaintiffs.

## VICARIOUS LIABILITY

59.     Whenever in this Petition it is alleged that the J&J Defendants did or omitted to do any act, it is meant that the J&J Defendants' officers, agents, servants, employees, or representatives did or omitted to do such act and that at the time such act or omission was done, it was done with the full authorization or ratification of the J&J Defendants or was done in the normal and routine course and scope of employment of the J&J Defendants' officers, agents, servants, employees, or representatives.

## PLAINTIFFS' DAMAGES

60.     As a direct and proximate result of the J&J Defendants' improper acts and/or omissions described herein, Plaintiffs were caused to suffer severe injuries and damages, including the following:

      a.     Physical pain and mental anguish sustained in the past;

      b.     Physical pain and mental anguish that, in reasonable probability, Plaintiffs will sustain in the future;

c.   Disfigurement sustained in the past;

d.   Disfigurement that, in reasonable probability, Plaintiffs will sustain in the future;

e.   Physical impairment sustained in the past;

f.   Physical impairment that, in reasonable probability, Plaintiffs will sustain in the future;

g.   Loss of earning capacity sustained in the past;

h.   Loss of earning capacity that, in reasonable probability, Plaintiffs will sustain in the future;

i.   Medical care expenses incurred in the past; and

j.   Medical care expenses that, in reasonable probability, Plaintiffs will incur in the future.

## LOSS OF CONSORTIUM

61.   As a direct and proximate result of the J&J Defendants' conduct detailed above, the male Plaintiffs were injured and caused to lose the love, companionship, society and consortium of their respective spouses (the female Plaintiffs). The ability of the female Plaintiffs to render services and assistance to the male Plaintiffs has been impaired and depreciated and will be so impaired and depreciated for a long time to come; the male Plaintiffs have necessarily incurred expenses for medical attendance in attempting to cure the female Plaintiffs of their said injuries and it will be necessary for the male Plaintiffs to incur further expenses, all to their damage.

## EXEMPLARY DAMAGES

62.   The J&J Defendants' conduct described herein, when viewed objectively from the standpoint of the J&J Defendants at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Moreover, the

J&J Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others.  Thus, Plaintiffs seeks exemplary damages in an amount to be determined by the jury.

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

63.     Plaintiffs plead that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiffs had been injured, the cause of the injury, and the tortuous nature of the wrongdoing that caused the injury.

64.     Despite diligent investigation by Plaintiffs into the cause of their injuries, including consultations with Plaintiffs' medical providers, the nature of Plaintiffs' injuries and damages and their relationship to the Pelvic Mesh Products and the J&J Defendants' wrongful conduct was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiffs' claims. Therefore, under appropriate application of the discovery rule, Plaintiffs' suit was filed well within the applicable statutory limitations period.

65.     The J&J Defendants are further estopped from asserting a statute of limitations defense because these Defendants, individually or in concert, fraudulently concealed from Plaintiffs the nature of Plaintiffs' injuries and the connection between these injuries and Defendants' tortious conduct.

## JURY TRIAL DEMAND

66.     Plaintiffs hereby respectfully request a trial by jury and submit the appropriate fee herewith.

## PRAYER

67.     WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the J&J Defendants be cited to appear and answer herein, and that upon final hearing hereof, Plaintiffs have judgment against the J&J Defendants for all damages to which they are entitled under the laws of the State of Texas, which amount exceeds the minimum jurisdictional limits of this Court; for pre-judgment interest in accordance with law and/or at the highest legal rate; for interest on the judgment; for costs of suit; for exemplary damages; and for such other and further relief, either at law or in equity, to which Plaintiffs has shown or will show themselves justly entitled.

Respectfully Submitted,

s/ Tim K. Goss
**Tim K. Goss**
Texas Bar No. 08222660
tim@freeseandgoss.com
**Tamara L. Banno**
Texas Bar No. 24012240
tammy@freeseandgoss.com
**Freese & Goss, PLLC**
3031 Allen St., Ste. 200
Dallas, TX  75204
P:  214.761.6610
F:  214.761.6688

**Richard A. Capshaw**
Texas Bar No. 03783800
richard@capslaw.com
**Capshaw & Associates**
3031 Allen St., Ste. 201
Dallas, TX  75204
P:  214.761.6610
F:  214.761.6611

**David P. Matthews**
Texas Bar No. 13206200
dmatthews@thematthewslawfirm.com
**Julie L. Rhoades**
Texas Bar No. 16811710
jrhoades@thematthewslawfirm.com

**Matthews and Associates**
2509 Sackett St.
Houston, TX  77098
P:  713.522.5250
F:  713.535.7184

**Peter de la Cerda**
Texas Bar No. 24045769
peter@edwardsdelacerda.com
**Kevin L. Edwards**
Texas Bar No. 24040853
kevin@edwardsdelacerda.com
**Edwards & de la Cerda, P.L.L.C.**
3031 Allen St., Ste. 100
Dallas, TX  75204
P:  214.550.5239
F:  214.722.2101

**ATTORNEYS FOR PLAINTIFFS**

# EXHIBIT 1

| Female Plaintiff's First Name | Female Plaintiff's Last Name | Client State | Male Plaintiff's Full Name | Implant Date | Product |
|---|---|---|---|---|---|
| Brenda | Abouarra | NC | | 8/26/2010 | Gynemesh |
| Hyly | Bartos | WI | | 4/30/2007 | Gynemesh |
| Melissa | Blocker | MS | | 9/1/2009 | Gynemesh |
| Virginia | Botruff | SC | | 06/19/2006 | Gynemesh |
| Denise | Bragg | TX | | 9/19/2006 | Gynemesh |
| Wendy | Browning | NH | | 5/10/2004 | Gynemesh |
| Christine | Burke | NH | Thomas F. Burke | 4/21/2008 | Gynemesh |
| Jennifer | Call | NM | | 08/27/2004 | Gynemesh |
| Deborah | Chambers | NC | | 10/04/2005 | Gynemesh |
| Della | Collins | NC | | 7/5/2004 | Gynemesh |
| Teresa | Cook | MA | | 4/14/2008 | Gynemesh |
| Madeline | Faiella | NY | | 06/23/2009 | Gynemesh |
| Vickie | Fischer | WI | | 1/31/2006 | Gynemesh |
| Bernadette | Gilleski | WI | | 3/23/2004 | Gynemesh |
| Evelyn | Graham | MS | | 2/16/2009 | Gynemesh |
| Paula | Gregory | NJ | | 7/15/2005 | Gynemesh |
| Karen | Hager | MD | | 12/14/2006 | Gynemesh |
| Amy | Holt | WA | | 12/1/2004 | Gynemesh |
| Marcia | Kane | MD | | 2/25/2011 | Gynemesh |
| Debra | Langendorf | WI | | 10/25/2007 | Gynemesh |
| Christina | Lathrop | WI | | 10/29/2009 | Gynemesh |
| Tammy | Layton | MD | | 9/14/2010 | Gynemesh |
| Helen | Lingle | MT | | 1/11/2011 | Gynemesh |
| Kim | Lockman | MT | | 04/27/2009 | Gynemesh |
| Sandra | Lofaro | NC | | 3/27/2007 | Gynemesh |
| Maryann | Mack | SC | | 07/12/2007 | Gynemesh |
| Patricia | Miller | WA | | 5/10/2011 | Gynemesh |
| Virginia | Murphy | WA | | 08/26/2010 | Gynemesh |
| Carol | Norris | MD | | 04/30/2009 | Gynemesh |
| Marti | Northover | MA | | 6/9/2004 | Gynemesh |
| Barbara | Nowak | WI | | 4/5/2006 | Gynemesh |
| Victoria | Overton | WA | | 9/20/2011 | Gynemesh |
| Barbara | Paris | WA | | 5/5/2004 | Gynemesh |
| Darlene | Reiss | SD | | 10/7/2004 | Gynemesh |
| Susan | Richards | NH | | 11/15/2005 | Gynemesh |
| Verna | Rosenberg | WA | | 10/29/2008 | Gynemesh |
| Carol J. | Sales | NY | | 8/8/2005 | Gynemesh |

# EXHIBIT 1

| Female Plaintiff's First Name | Female Plaintiff's Last Name | Client State | Male Plaintiff's Full Name | Implant Date | Product |
|---|---|---|---|---|---|
| Susan | Schmidt | WA | | 5/10/2006 | Gynemesh |
| Felicia | Scott | NC | Eugene Scott | 12/06/2005 | Gynemesh |
| Deanna | Stevens | WA | | 10/8/2003 | Gynemesh |
| Coralene | Steverson | MS | | 4/7/2010 | Gynemesh |
| Josephine | Tedeschi | RI | | 2/17/2004 | Gynemesh |
| Barbara Rose | Tewksbury | RI | | 6/28/2005 | Gynemesh |
| Brenda J. | Thompson | SC | | 04/23/2008 | Gynemesh |
| Donna | Travers | MS | | 05/01/2012 | Gynemesh |
| Kathleen | Vertz | WI | | 7/19/2005 | Gynemesh |
| Heidi | Wooley | WA | | 8/9/2011 | Gynemesh |